Filed 4/9/21  P. v. Stewart CA2/1

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION ONE

| | |
|---|---|
| THE PEOPLE,<br><br>    Plaintiff and Respondent,<br><br>    v.<br><br>RANDALL DEE STEWART,<br><br>    Defendant and Appellant. | B301204<br><br>(Los Angeles County<br>Super. Ct. No. YA095772)<br><br>ORDER MODIFYING OPINION<br>AND DENYING REHEARING<br><br>[NO CHANGE IN JUDGMENT] |

THE COURT:

It is ordered that the opinion filed herein on April 2, 2021, be modified as follows:

1.  On page 2, line 5, "80 years to life in prison" will be modified to read "60 years to life in prison."

2.  On page 36, the first sentence in the last full paragraph, "80 years to life" will be modified to read "60 years to life."

This modification effects no change in the judgment.
Appellant's petition for rehearing is denied.
NOT TO BE PUBLISHED

_____

CHANEY, J.        BENDIX, Acting P. J.    FEDERMAN, J.*

* Judge of the San Luis Obispo County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION ONE

| | |
|---|---|
| THE PEOPLE, | B301204 |
| Plaintiff and Respondent, | (Los Angeles County Super. Ct. No. YA095772) |
| v. | |
| RANDALL DEE STEWART, | |
| Defendant and Appellant. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Eric C. Taylor, Judge.  Affirmed in part, reversed in part, and remanded with directions.

Theresa Osterman Stevenson, under appointment by the Court of Appeal, for Defendant and Appellant.

Xavier Becerra, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant Attorney General, Steven D. Matthews and Michael J. Wise, Deputy Attorneys General, for Plaintiff and Respondent.

_____

Randall Dee Stewart appeals from a judgment entered after a jury found him guilty of second degree murder and found firearm enhancement allegations to be true under Penal Code section 12022.53, subdivisions (b)-(d).[1]  The trial court sentenced him to 80 years to life in prison, after finding prior conviction allegations to be true.  Stewart contends (1) the murder conviction and true findings on the firearm enhancement allegations are not supported by sufficient evidence; (2) the trial court erred in declining to remove a juror for alleged bias against Stewart and witnesses; (3) the trial court erred in denying Stewart's motion for new trial based on insufficiency of the evidence and ineffective assistance of trial counsel in failing to call a witness; (4) the judgment must be modified in light of Senate Bill No. 136 to strike prior prison term enhancements under section 667.5, subdivision (b) because Stewart did not serve a prior prison term for a sexually violent offense; and (5) the matter must be remanded because the trial court did not exercise informed discretion and consider whether to impose a term less than 25 years to life for the firearm enhancement.  We agree with Stewart's contentions regarding the prior prison term enhancements and the firearm enhancements and reject his other contentions.  We modify the judgment to strike the prior prison term enhancements and remand the matter for the trial court to determine whether to strike the firearm enhancement under section 12022.53, subdivision (d) and impose the enhancement provided under section 12022.53, subdivision (b) or (c).

---

[1] Further undesignated statutory references are to the Penal Code.

2

## BACKGROUND

### I.    Procedural history of case

An April 4, 2017 information charged Stewart with one count of murder (§ 187, subd. (a)) and one count of misdemeanor vandalism (§ 594).  The information also alleged firearm enhancement allegations as to the murder (§ 12022.53, subds. (b), (c) & (d)) and prior conviction allegations (§§ 667, subds. (a)-(j), 667.5, subd. (b) & 1170.12).

Stewart went to trial in July 2017.  The jury found him guilty of misdemeanor vandalism but could not reach a verdict on the murder charge, deadlocking 11-to-one in favor of a guilty verdict.  The trial court declared a mistrial as to the murder count.  On appeal, Stewart does not challenge the verdict on the vandalism charge.

The prosecution retried Stewart on the murder count in a second trial that commenced in October 2017.[2]  Below is a summary of the pertinent facts presented at Stewart's second trial.

### II.    Prosecution Case

In October 2015, defendant Stewart and Anthony Depiazza, the murder victim, rented rooms in a home owned by Bruce Ciarrocchi.  As described below, evidence presented at trial demonstrated Depiazza's murder occurred at Ciarrocchi's home in October 2015.

---

[2] In Stewart's first trial, the jury only had the option of finding him guilty of first degree murder.  In his second trial, the jury was instructed on first and second degree murder.

## A. The residents of the home where the murder occurred

Ciarrocchi owned a two-story, four-bedroom home in Rancho Palos Verdes. In October 2015, he slept in the downstairs den and rented out the four bedrooms. Stewart and his girlfriend, Marjorie Bellhouse, rented the upstairs master bedroom. Regina Arcuri rented the bedroom across the hall from Stewart. Depiazza (known to the other residents of the home as "Tone") rented the room next to Arcuri. Jade McMahan and her boyfriend Jason Hodges rented the downstairs bedroom. Among the residents and friends who frequented the home, drug use (and abuse) was common, namely heroin and methamphetamine.

## B. Deputies conduct a welfare check for Depiazza

On October 31, 2015, at around 1:00 a.m., six deputies from the Los Angeles County Sheriff's Department conducted a welfare check at Ciarrocchi's home based on an anonymous tip that Depiazza had been shot (not necessarily killed) at the home on October 25, 2015. At least one of the deputies was familiar with the home because he had been there on 15 to 20 prior occasions for drug-related calls. He also knew that Ciarrocchi rented out bedrooms in the home.

Ciarrocchi answered the door and allowed the deputies to walk through the house. The deputies noticed that one of the upstairs bedrooms appeared unoccupied. It was clean and nearly empty, containing only a bed and a dresser, while the remainder of the home was very dirty and unkempt. The deputies questioned Ciarrocchi, Stewart, Bellhouse, Arcuri, McMahan, Hodges, and two nonresidents, inquiring about Depiazza, using his given name not his nickname, Tone. Stewart told a deputy he did not know Depiazza, and Depiazza did not live at the home.

4

The deputies did not note anything that required further examination or inquiry.

### C.    Deputies locate Depiazza's body

On November 23, 2015, a man notified the Riverside County Sheriff's Department that he had observed what appeared to be remains the day before, while on a bicycle ride with his son in a rural area of Perris, in Riverside County. The item was wrapped in a tarp and buried under dirt, next to a tree. Initially, the man thought the item might be a dog's body. After discussing the matter with a friend, the man contacted the sheriff's department the next day, and returned to the scene with a deputy. The deputy made a cut in the tarp and observed part of a human foot. He called additional deputies to the scene, and eventually the body (later identified as Depiazza's body) was transported to the coroner's office.

On November 24, 2015, a forensic pathologist performed an autopsy on Depiazza's body. When the pathologist received the body, it was wrapped in three layers of tarps and a bed sheet. Depiazza's nude body was under the bed sheet and on top of a jacket. His legs were wrapped in cellophane and inside a garbage bag. His head was also wrapped in cellophane, and his left arm was in a garbage bag. The pathologist determined Depiazza died as a result of two gunshot wounds to the chest, one in the center and the other in the upper left part of the chest. The bullets exited the body. Based on the wounds, the pathologist determined that Depiazza's body was lower than the gun when the gun was fired. Some of the fingers on Depiazza's right hand (which had not been wrapped in a garbage bag like the left hand) were missing. The pathologist testified that a small animal had chewed off Depiazza's fingers.

In the investigation of the shooting, there was no determination regarding the type of gun or caliber of bullet used.

**D.    Deputies arrest Ciarrocchi on an unrelated warrant and take all persons present at the home to the station for questioning**

On December 7, 2015, at around 8:00 a.m., nine sheriff's deputies went to Ciarrocchi's home and served him with an arrest warrant for driving on a suspended license.  The homicide division of the Los Angeles County Sheriff's division tasked the deputies with seeking the cooperation of everyone in the home to be transported to a sheriff's station for questioning regarding Depiazza's death.  Without incident, and within five to 10 minutes of the deputies announcing their presence, Ciarrocchi, Arcuri, McMahan, Hodges, and two nonresidents exited the home and were transported to the station.

 The deputies determined there were two people in an upstairs bedroom who had not exited the home (later identified as Stewart and his girlfriend Bellhouse).  The deputies repeatedly issued demands over a loudspeaker for Stewart and Bellhouse to come out.  There was no response.  At around 8:30 a.m., a detective went upstairs and called out to Stewart and Bellhouse.  They did not respond, and the detective heard no noise coming from the bedroom.  The detective waited upstairs for a few hours in a protective stance, armed with an AR-15 rifle, periodically calling out for Stewart and Bellhouse to exit the room.  Around 11:30 a.m., the detective heard a toilet flush in the bathroom attached to the master bedroom.  The detective again called out for Stewart and Bellhouse to exit.  Stewart responded that he would come out after he finished his cigarette.  Sometime after 12:00 p.m., Stewart and Bellhouse exited the home.  In the

6

more than four hours the deputies were at Ciarrocchi's home, they had established a perimeter around the house, made about 50 announcements over the loudspeaker for Stewart and Bellhouse to come out, evacuated neighbors, and called in their Special Enforcement Bureau (a SWAT team).

Two members of the Special Enforcement Bureau escorted Stewart from the house to Deputy Ashly Castro's patrol car. Stewart sat in the back of the patrol car for about 30 minutes before Castro transported him to the station. During that time, Stewart had two outbursts when he banged his head against the patrol car window three to four times (six to eight times total), breaking the window frame.[3] He also yelled (making a sound, not a word). Castro told Stewart to stop banging his head, and he did. He did not speak to her while he sat in the patrol car or on the drive to the station.

Deputy Castro did not observe any signs indicating Stewart was under the influence of alcohol. She watched him as he was escorted from the house to her patrol car, and he did not stagger. Nor did he have trouble walking when she escorted him into the station. She did not notice an odor of alcohol when she was near him. In filling out the booking forms, Castro asked Stewart if he regularly used drugs. He told her he used heroin and methadone every day and had last used heroin the day before on December 6, 2015. Castro was with Stewart for about an hour and a half on

---

[3] The guilty verdict on the vandalism count in Stewart's first trial was based on evidence that Stewart broke the window frame in the patrol car.

December 7, 2015, and during that time it did not appear to her that he was under the influence of alcohol or drugs.[4]

### E. Detectives interview witnesses at the station

#### 1. Regina Arcuri's interview

At trial, the prosecutor played for the jury audio recordings from Arcuri's December 7, 2015 interviews with detectives at the station. The prosecutor also provided transcripts of the interviews, which were admitted into evidence and are included in the record on appeal.

Arcuri's first interview with the detectives investigating Depiazza's shooting began at about 9:30 a.m. on December 7, 2015, an hour and a half after deputies served the arrest warrant on Ciarrocchi. The detectives showed Arcuri a photograph of Depiazza, and she identified him as "Tone," a man who moved into Ciarrocchi's home in September 2015 and stayed in the bedroom next to hers. They asked her who stayed in the bedroom across the hall from her, and she named Stewart, who she referred to by the nicknames "Slow Lane" or "Slow." She stated that McMahan and Hodges (who she knew as Jade and Jason) lived in the downstairs bedroom.

The detectives asked Arcuri about the rental arrangement between Ciarrocchi and Depiazza. According to Arcuri, Ciarrocchi did not know Depiazza well when he rented the room to him. Depiazza paid Ciarrocchi some rent money but not the

---

[4] At trial, Stewart presented the theory that he did not refuse to exit the house for several hours (disputing consciousness of guilt). Instead, he presented the theory that he was so intoxicated and sleeping so deeply that he did not hear deputies calling out to him over a loudspeaker and outside his bedroom door for more than three hours.

entire amount he was supposed to pay. Ciarrocchi asked Depiazza about the outstanding amount a few times, but they did not argue about it. Arcuri explained that none of the residents paid their rent, and Ciarrocchi still allowed them to stay at his home. Arcuri had been living there for three months and she had only paid $500, the amount of one month's rent.

The detectives asked Arcuri to tell them what happened at Ciarrocchi's house before Halloween (the month after Depiazza moved into the home). They told her they did not believe she was involved in the incident. She stated that Depiazza and his friends "got into Slow's [Stewart's] stuff"; Stewart confronted Depiazza; and Depiazza left Ciarrocchi's house in the middle of the night "with some girl." When she did not see Depiazza for three or four days, she inquired about him, and some of the residents told her he had moved out of Ciarrocchi's house.

Arcuri provided further details about what led to the confrontation between Stewart and Depiazza. She stated that a man named Shane, who associated with some of the residents, brought another man to Ciarrocchi's home. While the (unidentified) man was in the house, Shane stole the man's property from the man's car. Then Shane lied and told the man that Stewart stole his property. Shane and the man were friends with Depiazza.

The detectives asked Arcuri if Stewart had a gun. She told them she had only seen him with a fake, gold gun. The detectives told Arcuri they were investigating Depiazza's murder. Arcuri stated she did not know Depiazza was dead. The detectives said they knew what happened. They already knew the answers to the questions they were asking, and they wanted Arcuri to tell them the truth. Throughout the interview, the detectives

9

referenced Arcuri's criminal history and her numerous incarcerations.

Arcuri stated that while she was home and Stewart was out, Depiazza, Shane, and a man named Isaac (later identified as trial witness Quaid Isaac Erekson) broke into Stewart's bedroom and went through all his stuff. While this was going on, Arcuri was in her bedroom with the door shut, watching a movie with a woman named Kyschlehohn Adoberavoski (who Arcuri and other witnesses referred to as Kysch). Arcuri called Stewart to notify him that the men were in his room, but she could not reach him. In the early evening, when Stewart returned to the house, Arcuri told him what happened, and Stewart went into Depiazza's room and confronted him. Arcuri heard Stewart and Depiazza arguing about Depiazza going into Stewart's room. She heard Depiazza blaming Shane for the incident. Arcuri told the detectives that she was a heroin addict—a fact she repeatedly volunteered—and that she and Kysch were in her bedroom using heroin and "nodding off" as the confrontation was occurring.

The detectives inquired about who else was in the house when the confrontation between Stewart and Depiazza occurred. Arcuri said Hodges was not there; she was not sure if McMahan was there; Bellhouse (Stewart's girlfriend) may have been home; and she recalled that Ciarrocchi "was nodded off downstairs" when she went around the house looking for someone to give her a cigarette.[5] There was a woman with Depiazza, who was also in the house.

Arcuri said to the detectives that she did not know anything about anyone being shot at Ciarrocchi's house, and she

---

[5] Like Arcuri, Ciarrocchi was a heroin user.

denied hearing gunshots.  She recalled the day after the argument between Stewart and Depiazza, a woman named Birdie came to the house and asked her if Depiazza got shot.  Arcuri denied it and asked Birdie why she would say that, and Birdie said Quaid Isaac Erekson told her Depiazza's body had been found.  According to Arcuri, while Birdie was crying in her presence about Depiazza's purported death, Depiazza called Birdie on her cell phone, so Arcuri realized he was not dead.

The detectives asked Arcuri why people were saying she "helped clean the house, clean the room [referring to Depiazza's bedroom]."  She indicated she helped clear out Depiazza's personal property four or five days after he moved out because he left several items there (clothes, a television, laptops, a bag of wigs).  She added, "Everybody helped clean up.  Everybody helped move his stuff downstairs."  The detectives asked how she knew Depiazza was not coming back to pick up his property.  She responded that Stewart told her Depiazza was not coming back.  Ciarrocchi asked her to help clean up the room because he wanted to rent it out.  Kysch helped too.  Arcuri did not see any blood in the room.

According to Arcuri, a new couple moved into Depiazza's old room in or around November 2015.  Before they moved in, Ciarrocchi replaced the carpet and painted the walls.

Arcuri told the detectives she had the stomach flu and needed to be in her bed.  The detectives ended the interview, but Arcuri remained in custody.

About an hour later, a detective interviewed Arcuri again, asking her to start over and explain what happened.  Arcuri began as follows:

11

"[Arcuri:] Okay. I was in my room watching TV with [Kysch].

"[Detective:] About what time?

"[Arcuri:] I just know it was evening time.

"[Detective:] Okay.

"[Arcuri:] And . . . fuck, I do not want to do this. And um . . . Slow, Randy [referring to defendant Randall Stewart] . . . went into Tone's [Depiazza's] room and I heard two shots.

"[Detective:] You heard two gun shots?

"[Arcuri:] Yes. I heard two gun shots.

"[Detective:] Okay.

"[Arcuri:] And . . . there was a lot of people in the house. There was a lot of people. There was the girl that Tone had with him. There was Jade [McMahan]. There was me, there was [Kysch]. There was Bruce [Ciarrocchi]. . . ."

Arcuri stated that after she heard the gunshots, Stewart opened her door and asked if everybody was okay. She told him they were fine and asked what happened. Stewart responded, "Nothing, don't worry about it." Arcuri told the detective she did not see Depiazza's body, and she did not know what they did with it. She remained in her bedroom and did not help clean. Kysch helped clean the room and the blood, which made Arcuri mad. She asked Kysch why she would do that and told Kysch she was now an accomplice.

According to Arcuri, the shooting occurred as the sun was setting. She recalled that, because of the time of day, Stewart was worried that the neighbors had heard the gunshots and would call the police.

Arcuri told the detective Hodges was not home when the shooting occurred. She recalled that as soon as he returned,

12

McMahan told him she had heard two gunshots. McMahan "was freaking out." Hodges came to Arcuri and asked if what McMahan heard were gunshots. Arcuri denied it because that is what Stewart had told her to say.

During the interview, the detective asked Arcuri if she was okay and if she needed water. Arcuri responded, "I'm just sick. I need to go home."

Arcuri revealed during this interview that a man named Nick Sola, who she referred to as "Stranger," was in the bedroom with her and Kysch when the shooting occurred. The bedroom door was closed. The three of them had just used heroin. Sola overdosed. Arcuri was reviving him when she heard the gunshots. Sola jumped up and ran out of the bedroom, leaving the door partly open; and that was when Stewart came into her room and asked if everyone was okay. According to Arcuri, Ciarrocchi was downstairs in his den, McMahan was downstairs in her bedroom, and Depiazza's female friend was downstairs in the kitchen at the time of the shooting.

Arcuri added that prior to the gunshots, she heard the sound of a "door being kicked open." Seven to 10 seconds later she heard the gunshots. She assumed Stewart was the person who kicked in the door because he was the only person in the hallway right after she heard the gunshots.[6] Stewart appeared

---

[6] Deputy Lamont Dobbins testified at trial that when he walked through Ciarrocchi's house on October 31, 2015 during the welfare check for Depiazza, he did not notice a door that looked like it had been kicked in or replaced. He only quickly scanned the upstairs area of the home, however, because there were already four other deputies upstairs, and he wanted to cover the garage area of the home.

"frantic" when he asked if everyone was okay. Arcuri thought Stewart wanted to know who was in the house and where they were located. She added, "I think it [the shooting] happened out of anger and he [Stewart] didn't realize how many people were in the house when it happened."

Arcuri again told the detective that Depiazza and his friends had broken into Stewart's room three to four days earlier, and Stewart had been "steam[ing]" about it. Describing what the men did in Stewart's room, Arcuri said: "[They took] everything-- jewelry, um . . . family heirlooms, clothes--anything and everything, they took from him. They turned his room upside down. They poured oil on his dresser, they poured--stuff they didn't have to do, you know what I mean? They tossed his room up." She reiterated that Shane had lied and told Depiazza and his friend that Stewart had stolen the man's property. She explained that Shane had asked Stewart to store the man's backpacks in Stewart's room. When Depiazza and his friends broke into Stewart's bedroom, the man recovered his backpacks and Depiazza and the others (Shane and Erekson) stole Stewart's property and "trash[ed]" his room. According to Arcuri, Stewart "walked around the house angry" for three or four days, saying, "that motherfucker's got his nerve walking by my room smiling and grinning, speaking about Tone [Depiazza]." Arcuri maintained that she had never seen Stewart with a gun.

Arcuri stated that the day after she helped move Depiazza's property out of the house, she "got scared" and "spooked," so she left the house with Kysch and they stayed in a hotel room for two days. After Arcuri returned to Ciarrocchi's home, Kysch asked her every few days or every week if the police had come to the house. Arcuri thought about calling the police but did not

14

because she lived with Stewart, and he told her to say Depiazza "packed up and split in the middle of the night . . . with some girl," if she were ever confronted by the police.

The detective asked Arcuri if she knew where Depiazza was shot. She responded, "[h]is chest and his neck." The detective asked how she knew that. She said Stewart told her: "When he was telling me to tell, to say, um . . . oh, god, they're going to kill me. Um, when he said to say that he packed up and left with the girl or whatever, and I said why? Is he not here anymore? And he said no, I put one in his chest and one in his neck."

Arcuri said she did not understand why she had been booked for the murder when the detectives knew she was not involved. She said she told the truth and she wanted to go home.

Detective Margarita Barron, who participated in both of Arcuri's interviews, testified at trial that Arcuri was curled up on the floor, going through heroin withdrawal, during part of the interviews. Detective Barron also confirmed that Arcuri was sniffling throughout the interviews—as heard on the audio recordings played for the jury—which is a symptom of heroin withdrawal.

### 2. Quaid Isaac Erekson's interview

On January 6, 2016, while he was in Los Angeles Police Department custody after an arrest unrelated to the shooting, Erekson asked to speak to the investigating detective in this case, stating he had information to share. The detective interviewed Erekson. The prosecutor played for the jury the audio recording of this interview. The prosecutor also provided a transcript of the interview, which was admitted into evidence and is included in the record on appeal.

15

Erekson told the detective that on one occasion when he visited Ciarrocchi's home, there was "a lot of commotion" because Shane had stolen another man's property (Xbox and Play Station gaming systems), sold the property to Stewart (who Erekson referred to as "Slow Lane"), and Shane and Depiazza (who Erekson referred to as "Tone") "made it look like" Stewart had stolen the property. Depiazza, Shane, and the man broke into Stewart's room. The man took back his property, and Depiazza and Shane used the incident as an opportunity to go through Stewart's things and mess up his bedroom.

During this incident, Erekson was in Arcuri's bedroom. Depiazza came into the room and told Erekson, "there's an open season shopping right here, uh, in Slow's room." Erekson filled up a large bag with stuff he wanted from Stewart's room and left the house with it. Between the men, they "took everything that was of value" from Stewart's room. Erekson sold some of Stewart's property.

The following day, Erekson heard that "Mexicans . . . with tattoos . . . went to the house looking for" him. He was concerned, so he packed up the items he had not sold and brought them back to Ciarrocchi's house. He gave the items to Bellhouse, Stewart's girlfriend. He told her and Stewart, "I took your stuff, you know, my bad, I didn't know who you were." While he was at Ciarrocchi's house that day, Erekson ran into Depiazza, who said, "fuck that dude Slow Lane [Stewart] like he's a bitch. He ain't gonna do shit, you just should have just kept the stuff type shit [*sic*]." Erekson responded, "naw man, that shit ain't right. Like that fool is, like, kinda crazy I think."

Erekson told the detective that Stewart had a .25 caliber handgun, and he had seen Stewart and Shane "test firing" that

16

handgun sometime before Depiazza's shooting. Erekson also told the detective that the men were looking for the handgun when they ransacked Stewart's room before the shooting.

Erekson added that Depiazza told him to take stuff from Stewart's room as payback because Depiazza owed Erekson money after Erekson stole checks and gave them to Depiazza. Erekson explained, "that's why I felt it was okay to go take some stuff from Slow Lane. Because I didn't know Slow Lane, I never met him or anything."

Erekson and the detective discussed Erekson's criminal history and the case for which he was in custody. The detective asked Erekson if he was "hooked on meth." Erekson responded affirmatively and said he wanted to "go to rehab," asserting, "Jail is not going to benefit me."

Explaining why he came forward with this information, Erekson stated: "I see an opportunity to take and I took it. But I don't know if it helps you in any [*sic*] but, like--man I'd appreciate if you could get me out, like I know where there's an AK-47 too, like a loaded one."[7] The detective said he would see what he could do but he could not make any promises.

### F.    Bruce Ciarrocchi Dies

On December 4, 2016, a year after the arrest that began the investigation in this case, Ciarrocchi was found dead. An autopsy showed he died of natural causes, a combination of heart disease and diabetes.

---

[7] There is no evidence in the record indicating the reference to an AK-47 was related to this case.

## G. Arcuri does not appear at trial, and her conditional examination is read to the jury

In June 2017, a month before Stewart's first trial commenced, Arcuri appeared for a conditional examination in court under oath.[8] Arcuri did not appear at trial (either the first or the second trial that is at issue here). The prosecution read Arcuri's testimony from the conditional examination to the jury at the second trial. As described below, during her June 2017 conditional examination, Arcuri recanted her December 2015 statements to detectives about Stewart being the shooter, and for the first time she identified Ciarrocchi (who was deceased by the time of her conditional examination) as the shooter.

On June 15, 2017, at the outset of the first day of her conditional examination, Arcuri testified that she called the prosecutor that afternoon at 1:13 p.m. to request a ride to court for her conditional examination. She explained that during the drive to the courthouse, she told the prosecutor she was "loaded" because she had used heroin that day at 10:30 a.m., after only sleeping for two or three hours the night before. At that point, the prosecutor stopped his examination of Arcuri and asked the trial court to suspend the conditional examination. Arcuri responded: "I can't go to jail right now. What's up with that? Retarded. Retarded. All my stuff is out there on the fucking

---

[8] In connection with Stewart's motion for new trial, the prosecutor explained that the reason for the conditional examination was that the defense requested a continuance of the first trial. The trial court granted the defense's request but allowed the prosecution to conduct the conditional examination of Arcuri (presumably to preserve her testimony in case she failed to appear for trial which is exactly what occurred).

18

street.  I came last night.  I didn't voluntarily come.  It was a subpoena.  This is retarded." That concluded the June 15, 2017 portion of the conditional examination, as read to the jury at Stewart's second trial.  The trial court explained to the jury that Arcuri was remanded into custody and was taken back to court four days later, on June 19, 2017.

The prosecution then read to the jury Arcuri's testimony from her June 19, 2017 continued conditional examination. Arcuri testified that she was homeless and did not have a cell phone, which was the reason it was difficult for the prosecution to contact her.  She provided the location of the intersection where she stayed.

Arcuri confirmed that she lived at Ciarrocchi's home for three or four months but said she did not remember what year she lived there.  Ciarrocchi allowed her to live at his home for free; she did not pay rent.  Arcuri testified that she did not remember who else lived in the home with her and Ciarrocchi. She identified Stewart in court as "Slow Lane" and "Randy," someone she had known for five years on a casual "hi, bye" basis. She said she had seen Stewart at Ciarrocchi's home but did not know if Stewart lived there.  She knew Stewart had a girlfriend named "Margie" (Bellhouse).

Arcuri identified the upstairs bedroom where she stayed when she lived in Ciarrocchi's home, based on photographs the prosecutor showed her.  When the prosecutor asked her who stayed in the room next to her, she responded:  "Some tweaker dude.  Some tweaker dude.  I never seen his face.  I don't know his name.  I know he -- he lived in that room."  The prosecutor asked if she recognized the name "Tone" (Depiazza).  She replied, "I can't tell you if he lived in that room or not."  The prosecutor

19

showed her a photograph of Depiazza, and she said she did not recognize him and did not know if he stayed in the room next door to hers.  She also denied knowing who stayed in the room across the hall from her (which she previously identified as Stewart's room in her statements to detectives).  Later in her examination, however, she stated that Stewart could have been the person who stayed in that room, but she was "unclear."  When asked where Ciarrocchi stayed, she responded, "In a den, I think.  He could have stayed in a bedroom, in the bedroom" downstairs.

Arcuri denied she witnessed Shane and others steal from or vandalize Stewart's room in October 2015.  She said she did not know who Shane was, and she did not know if Depiazza and Shane were friends because she did not know who Depiazza was either.  The prosecutor showed her a photograph of Quaid Isaac Erekson.  She said she did not recognize him in the photo, but she recognized his name as someone who used to come to Ciarrocchi's house.  She said she had never had a conversation with him and did not remember if he had ever been in her room.

Arcuri also denied hearing gunshots at Ciarrocchi's home in October 2015.  She stated she "barely" remembered her interviews with detectives on December 7, 2015, and she did not remember telling them she heard gunshots.

At this point in the second trial, the prosecutor played for the jury the audio recording of Arcuri's first interview with detectives on December 7, 2015 (the same audio was played at the same point during Arcuri's conditional examination).  The trial court read to the jury the following stipulation of the parties: "A recording is being played to you.  It's not uncommon for officers to tell witnesses that they know the answers to

20

something to extract statements from the witness.  You're not to take the officer's statement in that questioning as proof of any fact in this case."

Arcuri acknowledged it was her voice on the recording, and she said she recognized the detectives' voices.  The prosecutor asked her:  "Is that an accurate rendition of the first interview that was conducted between yourself and the two detectives?"  Arcuri responded:  "I don't remember.  I know I was really dope sick that day because I had just gotten into a high-pursuit [*sic*] chase, and when I got home, I didn't feel well.  I went to bed.  I was sick, and the sheriffs came in.  So I really -- I was really, really dope sick.  [¶]  I know the second time they questioned me, I was on the floor wrapped up in a blanket throwing up, the second time."[9]

Arcuri explained that her memory of the events at issue in this case was clearer at the time she spoke to detectives in December 2015 than it was when she gave her conditional examination testimony in June 2017.  She also confirmed she told the detectives the truth during her first interview on December 7, 2015.  She stated that listening to the audio of that interview did not refresh her recollection of events at Ciarrocchi's house in October 2015.

_____

[9] During her interviews with detectives on December 7, 2015, Arcuri mentioned that she had been involved in a high-speed chase the night before (she was a passenger in the vehicle), and that her back and side were hurting as a result of that activity.  As set forth above, a detective confirmed at trial that Arcuri was curled up on the floor, going through heroin withdrawal, during the interviews.

The prosecutor showed Arcuri photographs of various vehicles.  She identified one as Bellhouse's car.  After her identification of Ciarrocchi's car, Arcuri spontaneously identified Ciarrocchi as the person who shot Depiazza.  The exchange between her and the prosecutor was as follows:

"[Prosecutor:]  Let me ask you about the cars.  Did you recognize the cars, the ones in the driveway?

"[Arcuri:]  Not the black truck.  I recognize the other as Bruce's [Ciarrocchi].

"[Prosecutor:]  So, you said you don't recognize the black truck that is parked in the driveway?

"[Arcuri:]  I don't know whose car it is.

"[Prosecutor:]  You do recognize the car parked on the curb in front of the house?

"[Arcuri:]  Correct.

"[Prosecutor:]  That's Bruce [Ciarrocchi].  You said, that was -- you identified in People's 2-AA, that's Bruce that I'm showing you?

"[Arcuri:]  Yes.  That one.  That's Bruce.  Bruce, the one that shot Tone [Depiazza].

"[Prosecutor:]  Excuse me?

"[Arcuri:]  Bruce, the one that shot Tone.

"[Prosecutor:]  So, you're saying that Bruce is the one that shot who?

"[Arcuri:]  Tone.

"[Prosecutor:]  I thought you said you didn't even know who Tone was?

"[Arcuri:]  I do after you showed me the picture.  I said I couldn't pick him out of the lineup until you told me it was Tone.

"[Prosecutor:]  Let me back up.  What lineup?

22

"[Arcuri:] If he was in a lineup, I would not have been able to pick him out until you told me that was Tone. I did not know that was Tone until you told me that was Tone in the picture. It was a long time ago."

Arcuri acknowledged this was the first time she had ever identified Ciarrocchi as the shooter. She said she was scared to do so before, but the prosecutor recently informed her that Ciarrocchi was dead.[10]

According to Arcuri, Ciarrocchi told her he shot and killed Depiazza over unpaid rent.[11] Ciarrocchi threatened her, telling her "if [she] told anybody, he would do the same thing to [her]." It was about a week after the shooting when they had this conversation in her room. Ciarrocchi "scared [her.]" She added: "Bruce had a different side to him not too many people knew. He had a very angry, violent side to him."

At this point in her conditional examination, Arcuri acknowledged that the shooting occurred in October 2015. Despite her fear of Ciarrocchi based on his threats to shoot and kill her, she lived in his home until December 7, 2015, when he was arrested. Explaining why she stayed, she testified: "Because drugs are very important to me, and he had lots of them. So I stayed." The prosecutor followed up: "But wouldn't you say that there are between drugs and your life, there are a lot more drugs

_____

[10] As set forth above, Ciarrocchi died in December 2016, more than six months before Arcuri gave her conditional examination testimony.

[11] As discussed above, the evidence at trial indicated Depiazza moved into Ciarrocchi's home less than two months before he was killed.

outside that house?" She replied, "Not when you can get them free from Bruce."

Arcuri explained the reason she had a second interview with the detective on December 7, 2015 was because she requested it. The prosecutor played for the jury the audio from that interview. Arcuri acknowledged it was her voice on the recording, she recognized the detective's voice, and she confirmed the entirety of the second interview was on the recording. She added: "But I was really dope sick and wanted to go home. I would have said anything. I would have told them anything to go home that day."

Arcuri testified that she lied when she told the detective Stewart shot Depiazza. She stated she never had a conversation with Stewart in which he confessed to being the shooter, despite what she told the detective. She added: "I guess I assumed Slow did it because Slow was the one that came up to my door, but Bruce [Ciarrocchi] told me a week or so after that he was the one who did it."[12] Arcuri explained that she told the detectives Stewart was the shooter because she was scared of Ciarrocchi, but she was not scared of Stewart because she had known Stewart for a long time. That concluded the reading of the transcript of Arcuri's June 19, 2017 testimony.

Arcuri's conditional examination continued the following day on June 20, 2017. The prosecution read the transcript to the jury at Stewart's second trial.

Arcuri identified the following people at Ciarrocchi's home at the time of Depiazza's shooting: Herself, Ciarrocchi, Stewart,

---

[12] This conversation with Ciarrocchi would have occurred more than a month before Arcuri told the detectives that Stewart was the shooter.

McMahan, Kysch, Stranger (Nick Sola), and Depiazza's girlfriend. She knew that Hodges (McMahan's boyfriend) was not home at the time of the shooting because she went downstairs to ask him for a cigarette, and he was not there. She recalled telling Hodges after he returned home that the noises McMahan heard were not gunshots, consistent with what she told the detective during her second interview. She could not recall who instructed her to say that to Hodges, and she did not remember telling the detective that Stewart told her to say that. Hearing the audio did not refresh her recollection regarding the statement she made. Nor did she remember telling the detective that Stewart told her what to say if anyone asked about Depiazza's disappearance. Later in her testimony, she stated that it was Ciarrocchi, not Stewart, who told her what to say about Depiazza's disappearance.

Arcuri stated she did not know if the shooting occurred in October 2015 (although she testified the day before that it did). She confirmed that at the time of the shooting she was in her bedroom with Kysch and Nick Sola, and the bedroom door was closed. She testified about Sola overdosing on heroin and her reviving him seconds before she heard the gunshots, as she told the detective. She stated she knew that Ciarrocchi was in Depiazza's room next door to hers at the time of the shooting because she heard his voice; she heard him yell " 'now' or something like that." She did not remember telling the detective that Ciarrocchi was in his den downstairs. She said she did not know where Stewart was at the time of the shooting.

Arcuri acknowledged during her testimony that Stewart entered her bedroom after the gunshots to see if everyone was okay. She said he looked "like he got out of bed." She added, "He

25

could have been still asleep.  It looked like he got startled with something, something woke him up, and he fled out of bed."

Arcuri also acknowledged that at some point prior to the shooting Shane, Erekson and Depiazza went into Stewart's room and stole his property and vandalized his room, although earlier in her conditional examination testimony she said she had no knowledge of this.  She tried to call Stewart to warn him about the men in his room, but she could not reach him.  She said she did not know if Stewart ever learned who entered his room, and she could not remember if she told him who it was.

On cross-examination by defense counsel, Arcuri testified that prior to her interviews with detectives, they fingerprinted her and charged her with Depiazza's murder.  They showed her photographs of Stewart and Ciarrocchi and told her they were suspects in the murder.  They also showed her photographs of Depiazza and six other individuals she did not know.  Defense counsel asked her:  "Did the police tell you at any point in time that Mr. Stewart was a suspect that they were very interested in or in some way thought was involved with this or had done the crime?  Arcuri responded, "I believe so."[13]  She testified that she made up her statements about Stewart being the shooter because she was in pain due to heroin withdrawal and wanted to go home, and she believed she was telling the detectives what they wanted to hear.

Arcuri stated she had seen Ciarrocchi with a gun prior to the shooting.  About six months before she moved into his home,

_____

[13] Detective Margarita Barron, who participated in both of the interviews with Arcuri, testified at trial that the detectives did not ask Arcuri any questions or show her any photographs prior to the start of the recorded interviews.

she fired a revolver with him in the backyard. She testified that she was afraid of Ciarrocchi. He had threatened to kick her out of his home for not paying rent, and he threatened her with bodily harm a few times after the shooting. She had also heard him ask Depiazza about paying rent a few times. According to Arcuri, Ciarrocchi was angry with Depiazza and did not want him at the house anymore. Depiazza had stolen Ciarrocchi's heroin.

As she told the detectives, Arcuri testified she had never seen Stewart with a gun or any weapon. She had seen him with a lighter that looked like a gun. She said she had never heard about Stewart threatening anyone, and she was never afraid of Stewart. She had not communicated with him since December 7, 2015.

Arcuri testified that the prosecutor promised to secure Section 8 housing for her and help her get her kids back if she told the truth. According to Arcuri, during that conversation with the prosecutor, he circled Stewart's name on the subpoena he asked her to sign, and he tapped the paper. On another occasion, the prosecutor bought dinner for her and her boyfriend. He gave her his work and personal telephone numbers and told her to call him if she needed food.

Arcuri testified that she had a prior conviction for possession of a controlled substance while armed with a loaded firearm.

### H. Other witnesses' trial testimony

#### 1. Quaid Isaac Erekson's trial testimony

Erekson testified at Stewart's second trial. He conceded he had an extensive criminal history, including convictions for grand theft auto, burglary, robbery, and drug-related offenses. He had

27

been using methamphetamine since 2012.  He sometimes stole and sold items so he could use the money to buy drugs.

Erekson stated he had been to Ciarrocchi's home four to six times.  He described it "as a trap house," with "dozens of people coming in and out, all day all night" and "[h]igh traffic."  He went there to visit Depiazza, who he knew for a year or two before the shooting.  He used to bring stolen goods to Depiazza to trade for drugs or other stolen goods.  At the time of the shooting, he did not consider Depiazza to be a friend because Depiazza owed him money from a deal regarding checks Erekson stole.  He described Depiazza as his "connection" for drugs, guns, and other items.  He believed Depiazza moved into Ciarrocchi's home around August 2015.

Erekson stated he met Arcuri and interacted with her during the four to six times he visited Ciarrocchi's house.  He did not consider Arcuri to be a friend.  She was someone he "got high with."

Erekson admitted he burglarized the upstairs master bedroom of Ciarrocchi's home with two other individuals.  At the time he entered the room and stole property, he believed it was Ciarrocchi's bedroom.  He later learned it was Stewart's bedroom.

Erekson explained that prior to the date he stole property from Stewart's bedroom, Depiazza had invited him to Ciarrocchi's house on a couple of occasions to case the home for items to steal. According to Erekson, Depiazza described Ciarrocchi as "a good dude," but "a little bitch," and said Erekson could "take whatever [he] want[ed]" from Ciarrocchi's home.  Depiazza also told Erekson that Ciarrocchi would not care if they stole items because the house was going into foreclosure and Ciarrocchi had no family and was a drug user.

Regarding the theft of Stewart's property, Erekson testified that two men broke the lock on Stewart's bedroom door and entered the room. At that time, Erekson was in Arcuri's bedroom using drugs. After the men left, Depiazza invited Erekson to take whatever he wanted from the room, telling him it was "open season." Erekson and Depiazza entered the room and tore the room apart, searching for anything of value. Erekson took jewelry, shirts, and coin and stamp collections from Stewart's room. Erekson considered Depiazza's debt to him paid because Depiazza allowed him to take whatever he wanted from the room. Erekson bagged up the property and left Ciarrocchi's house.

Erekson explained that he traded some of the property for drugs and money. He bought beer, cigarettes, and other items with the money. Two or three days later, he had a "change of heart." He was using crystal meth and he became paranoid. He learned that the property he had stolen belonged to Stewart. He heard rumors that someone might call the police on him or injure him. Depiazza was not answering his calls, and he knew that the residents of Ciarrocchi's home knew where he lived. It was rare for him to return property he had stolen; he had only done it three times. When asked by the prosecutor, however, he denied he was afraid of Stewart.

Erekson stated he went back to Ciarrocchi's house and returned the property to Stewart's girlfriend (Bellhouse). Stewart was there. Erekson had also taken some of Ciarrocchi's property, and he returned that as well. He apologized, and everything was fine. Stewart was not angry with him.

The prosecutor played the audio recording of Erekson's January 2016 interview with one of the investigating detectives

29

in this case (summarized above). Erekson commented: "Most of this -- it is basically all fabricated. I wanted to get out of jail. I was willing to do almost anything to get out of jail at any cost. I wanted to get high. I wanted to go back to my wife who was pregnant and had a miscarriage. I wanted to be back on the street." He explained that he downplayed his involvement in breaking into and ransacking Stewart's bedroom when speaking with the detective because he did not want to be charged with burglary. At this point in his trial testimony, Erekson admitted that it was he and Depiazza who broke into Stewart's bedroom, and Shane was there as well.

On cross-examination, Erekson testified that he had never seen Stewart with a gun, despite what he told the detective in January 2016 (that he had seen Stewart and Shane test firing a .25 caliber gun prior to the shooting). He stated that two weeks before the shooting, however, he saw Ciarrocchi with a .357 caliber revolver on two occasions. He also saw Ciarrocchi with a bag of .357 and .38 caliber ammunition. He had not told this to the detective.

Erekson also testified on cross-examination that he saw bank records Depiazza stole from Ciarrocchi indicating Ciarrocchi's house was in foreclosure. According to Erekson, Ciarrocchi was stressed about money, and the people staying at his house told him they were going to pay him rent, but they were just manipulating him.

### 2. Jade McMahan's trial testimony

McMahan testified that she had been struggling with drug addiction off and on since 1995. In 2015, she regularly used methamphetamine.

In mid-September 2015, McMahan and her boyfriend, Jason Hodges, began renting the downstairs bedroom in Ciarrocchi's home. They moved out after Ciarrocchi was arrested on December 7, 2015. During their tenure in Ciarrocchi's home, McMahan and Hodges made one rent payment in the amount of $200 or $300 (McMahan could not recall the exact amount). On occasion, McMahan bought food for Ciarrocchi and Hodges gave him drugs. Ciarrocchi never demanded money from McMahan and Hodges. McMahan never heard Ciarrocchi demand money from any of the residents in the home, but she heard him complain sometimes that no one was paying him. According to McMahan, Depiazza moved into Ciarrocchi's home around the same time McMahan and Hodges moved in, mid-September 2015.

McMahan testified that on the Sunday before Halloween in 2015, she came home to Ciarrocchi's house just before it started to get dark outside. When she pulled up to the house, Ciarrocchi was outside watering the lawn. When she went into the house, she saw Kysch. McMahan went into her bedroom, locked the door, and started putting away her groceries. Ten to 20 minutes later, she heard two loud noises, back to back, that sounded like firecrackers. She did not know what was going on, and she felt scared. She called Hodges but did not reach him. He called her back 30 to 45 minutes later and told her he was on his way home.

McMahan stated that before Hodges arrived home, Arcuri came to the bedroom door and asked McMahan what she was doing and if she was okay. She also asked McMahan if she could have a cigarette. McMahan did not want to open the door because she did not feel comfortable. She told Arcuri she was fine and that she could not open the door because she was about to get into the shower and was not dressed, which was untrue.

31

She might have slipped a cigarette under the door to Arcuri. According to McMahan, it seemed like Arcuri was anxious and really wanted McMahan to open the door. Arcuri's visit to McMahan's room occurred about 45 minutes to an hour after McMahan heard the two loud noises.

Hodges came home around 30 minutes later. McMahan told him about the loud noises she had heard. They gathered their things and went to a hotel for the night.

McMahon testified that she had never seen Ciarrocchi act in violence or anger. She described him as a nice person who never really bothered anyone, including about the rent. She did not interact much with Stewart, and never had any negative dealings with him.

## III. Defense Case

### A. Clementine Knox Bolling's trial testimony

Clementine Knox Bolling testified at trial that she was a custody assistant jailer, who interacted with Stewart when he was booked for murder on December 7, 2015. She filled out an "Intoxication Observation Sheet," noting on the form that Stewart was staggering and unsteady; his breath smelled like alcohol; his eyes were bloodshot, watery, and glassy; his speech was slurred; and he was uncooperative. Due to her observations, Stewart was placed in the "drunk tank" or "sobering cell," where he would be checked on every 30 minutes until he appeared "okay."

### B. Nick Sola's trial testimony

Nick Sola was incarcerated in prison for a felony conviction at the time he testified at trial.

He testified about an occasion when he went to the house where Arcuri was staying and used heroin and drank alcohol

with her in her bedroom.  Kysch was there too.  He used too much heroin and overdosed.  He passed out and was unconscious.  When he came to, he heard Ciarrocchi (who he knew by the nickname "Bird Dog") yelling and arguing with someone.  Then, he heard gunshots and quickly left the house.  He recognized Ciarrocchi's voice because he had used heroin with him.

On cross-examination, Sola acknowledged that when a detective interviewed him about the shooting, he did not mention hearing Ciarrocchi yell before the shots were fired.  Subsequently, he was interviewed by a defense investigator, who told him that Ciarrocchi was dead.  During that interview, he said for the first time that he heard Ciarrocchi yell before the shots were fired.  He testified that he only felt comfortable saying that after he learned Ciarrocchi was dead.

Sola also acknowledged he had been on the same bus as Stewart more than two times when the two of them were transported to court for this trial.  He said hello to Stewart but did not say anything else.

### C.     Corinne Orbison's trial testimony

Corinne Orbison testified she had known Stewart and his girlfriend Marjorie Bellhouse her entire life because both of them were her neighbors when she was growing up.  She also described Bellhouse as a close family friend.  She had never seen Stewart with a gun or ammunition.  Nor had she ever seen him fighting with, yelling at, or angry with anyone.

Orbison stated that shortly before Halloween in 2015, Bellhouse asked her to drive to Rancho Palos Verdes and pick up her and Stewart and drive them to Bellhouse's aunt's home in Wilmington.  When Orbison arrived at the house in Rancho Palos

33

Verdes that evening, Bellhouse and Stewart were waiting outside with their suitcases. Orbison drove them to Wilmington.

### D. Marjorie Bellhouse's trial testimony

Stewart's girlfriend, Marjorie Bellhouse, testified at trial. She stated she had known Stewart for 30 years because he was her neighbor, and they had been dating for two years.

Bellhouse produced receipts and testified that she and Stewart regularly paid Ciarrocchi rent from March through November 2015. She stated that Ciarrocchi signed the receipts. Originally, they paid $400 a month for a smaller bedroom, but when they moved into the master bedroom, they started paying around $800 a month.

Bellhouse testified that on October 25, 2015, she and Stewart were lying down in their bedroom when she heard a sound like a door being kicked in. The noise woke her up. Then she heard Ciarrocchi yell " 'out' " and other words she could not make out. Next, she heard "a couple popping sounds," like "firecrackers."

According to Bellhouse, Stewart jumped out of bed and left the room for around 20 minutes. She heard him check on Arcuri. When he returned, he told her to get dressed and said they were leaving the house. Bellhouse called Corinne Orbison to come pick them up and drive them to her aunt's house. A few days later, they returned to Ciarrocchi's house.

Bellhouse testified that for the three days before the deputies came to Ciarrocchi's house on December 7, 2015 to serve the arrest warrant, she and Stewart had been drinking alcohol and doing drugs (heroin and "speed") without sleeping. They finally went to sleep at around 5:00 a.m. on December 7. According to Bellhouse, Stewart passed out before she did. When

34

she woke up, deputies were banging on the door.  She and Stewart got up and got dressed.  It took a while (around 30 minutes) because they were still intoxicated.  Before she woke up, she did not hear the deputies trying to get her and Stewart's attention.

Bellhouse testified she had never seen Stewart with a gun or ammunition.  Nor had she ever seen him fight with anyone.  She described him as a "very docile man."

On cross-examination, Bellhouse testified that she did not know until December 7, 2015—when she was taken to the station for questioning—that the popping sounds she heard on October 25, 2015 were gunshots.  Prior to December 7, she never heard anyone mention gunshots.  During her December 7 interview with detectives, they asked her about blood on the stairwell in Ciarrocchi's house.  During her testimony, she explained:  "I told them that a few people had fallen right there.  I had been one of them, and I had hit my head, and it was blood from me cracking my head on the back.  And another guy had fallen right there too."  She did not tell detectives that she was in bed with Stewart when she heard the gunshots or that she heard Ciarrocchi's voice before she heard the gunshots.

Bellhouse testified about Erekson returning the property he had stolen from her and Stewart's bedroom.  She said she accepted his apology and told him she and Stewart would not give him any problems.

Bellhouse believed Depiazza had only lived at Ciarrocchi's home for a couple weeks prior to his death.

35

## IV. Verdicts, Motion for New Trial, and Sentence

The jury found Stewart guilty of second degree murder and found true the three firearm use allegations under section 12022.53, subdivisions (b)-(d).

As described in more detail below, the trial court appointed new counsel for Stewart, and he filed a motion for new trial based on ineffective assistance of trial counsel and insufficiency of the evidence presented at trial. After an evidentiary hearing, the trial court denied the motion for new trial.

In a court trial, the trial court found true the following special allegations: (1) Stewart served prison terms for seven prior felony convictions (§ 667.5, subd. (b)); (2) Stewart had a prior strike conviction under the "Three Strikes" law (§§ 667, subds. (b)-(j) & 1170.12); and (3) Stewart had a prior serious felony conviction (§ 667, subd. (a)(1)).[14]

The trial court sentenced Stewart to 80 years to life in prison: 15 years to life for the murder, doubled to 30 years under the Three Strikes law, plus 25 years to life for the firearm enhancement under section 12022.53, subdivision (d), and five years for the prior serious felony under section 667, subdivision (a)(1). The court stayed the sentence on the prior prison term enhancements under section 667.5, subdivision (b). For the misdemeanor vandalism, the court imposed a term of six months, with credit for time served.

---

[14] The prior strike and prior serious felony were from the same 2002 conviction for first degree burglary.

36

## DISCUSSION

## I. Sufficiency of the Evidence Supporting the Murder Conviction and the True Findings on the Firearm Enhancements

Stewart contends this court must reverse his murder conviction and the true findings on the firearm enhancements for insufficiency of the evidence, under both state and federal law standards. He argues "no rational trier of fact could have found beyond a reasonable doubt the prosecution proved he committed the offenses." For the reasons explained below, we reject his substantial evidence challenge.

"In assessing a claim of insufficiency of evidence, the reviewing court's task is to review the whole record in the light most favorable to the judgment to determine whether it discloses substantial evidence—that is, evidence that is reasonable, credible, and of solid value—such that a reasonable trier of fact could find the defendant guilty beyond a reasonable doubt. [Citation.] The federal standard of review is to the same effect: Under principles of federal due process, review for sufficiency of evidence entails not the determination whether the reviewing court itself believes the evidence at trial establishes guilt beyond a reasonable doubt, but, instead, whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. [Citation.] The standard of review is the same in cases in which the prosecution relies mainly on circumstantial evidence. [Citation.] ' "Although it is the duty of the jury to acquit a defendant if it finds that circumstantial evidence is susceptible of two interpretations, one of which suggests guilt and the other innocence [citations], it is

37

the jury, not the appellate court[,] which must be convinced of the defendant's guilt beyond a reasonable doubt. ' "If the circumstances reasonably justify the trier of fact's findings, the opinion of the reviewing court that the circumstances might also reasonably be reconciled with a contrary finding does not warrant a reversal of the judgment." ' " ' " (*People v. Rodriguez* (1999) 20 Cal.4th 1, 11.)

Substantial evidence presented at trial demonstrated Stewart had a motive for the murder. A few days before the shooting, Depiazza, a new resident of Ciarrocchi's home—who had only lived there for about a month—invited, encouraged, and collaborated with nonresidents of the home to break into Stewart's locked bedroom, vandalize the room, and steal any and all property they wanted, including clothing, jewelry, and stamp and coin collections.

Substantial evidence also demonstrated consciousness of guilt. The same evening as the shooting, Stewart and Bellhouse packed suitcases and called a friend to take them away from Ciarrocchi's house. They stayed away for a few days. A couple days later, when deputies conducted the welfare check for Depiazza, Stewart denied knowing Depiazza and said he had never lived at Ciarrocchi's home. On December 7, 2015, when all other residents and nonresidents in Ciarrocchi's home exited within five to 10 minutes of the deputies' arrival, Stewart and Bellhouse remained inside for more than four hours after deputies set up a perimeter around the home, evacuated neighbors, made at least 50 requests over a loudspeaker for them to exit, and banged on their bedroom door and called to them from right outside the door several times during a three-hour period, with no response from Stewart and Bellhouse. After

38

Stewart was placed in the patrol car, he had two angry outbursts, yelling and breaking the window frame of the car by banging his head against it.[15]

Although Arcuri expressed reluctance about identifying Stewart as the shooter during her second interview with the detective—noting "they're going to kill me"—she never wavered during her interviews from her initial and immediate statement that it was a confrontation with Stewart over the theft of Stewart's property that led to Depiazza's disappearance (initially stating Depiazza left in the middle of the night with a woman after his argument with Stewart). Stewart points out that Arcuri's statements to detectives were not under oath, while her conditional examination testimony (in which she identified Ciarrocchi as the shooter) was under oath. It was for the jury to decide which of Arcuri's accounts it believed: her statements to detectives in which she readily identified her fellow residents and the persons who stole Stewart's property; or her conditional examination testimony in which she denied knowing who lived with her on the second floor of Ciarrocchi's home, said she could not identify a photograph of Depiazza (who lived in the bedroom next door to hers for at least a month), and spontaneously

---

[15] It was for the jury to decide whether this evidence demonstrated consciousness of guilt or if there were other reasonable inferences to be drawn from the evidence (e.g., that Stewart only knew Depiazza as "Tone" and did not know who the deputies were referring to when they conducted a welfare check for "Anthony Depiazza," or that Stewart and Bellhouse were so intoxicated that they did not hear the deputies' demands for them to exit the house for more than three hours, or that they were only two of several residents who packed bags and left the home for a night or two after the shooting).

identified Ciarrocchi for the first time as the shooter, around 19 months after the shooting.[16]

Stewart emphasizes Arcuri's poor physical condition (heroin withdrawal) during her interviews with detectives, and her motive to lie (she wanted to tell the detectives something they wanted to hear so they would let her leave). The jury was fully apprised of Arcuri's physical condition and that she had been booked for murder. The jury heard Arcuri's statements on the audio recordings of her interviews, including symptoms of her heroin withdrawal (e.g., the sniffling). It was for the jury to evaluate Arcuri's credibility.[17]

Stewart complains that the jury could not properly evaluate Arcuri's credibility because she did not appear in person at trial. However, he does not challenge on appeal the reading of her conditional examination testimony, and the fact she did not appear in court does not impact our review for sufficiency of the evidence.

---

[16] Of course, the jury was tasked with evaluating the credibility of defense witnesses as well, including Bellhouse's testimony that she did not know or even suspect that the popping sounds she heard on October 25, 2015 were gunshots until she was taken to the station for questioning on December 7, 2015, and that the blood on the stairwell in Ciarrocchi's home was from her and other persons falling and injuring themselves.

[17] Stewart notes Arcuri's statement to the detective that Depiazza was shot once in the chest and once in the neck was incorrect. The autopsy showed Depiazza suffered two gunshot wounds to the chest. The jury was apprised of this discrepancy and was instructed on how to weigh such a discrepancy. It is not cause for us to reverse the murder conviction or the firearm use enhancements.

Testimony of a single witness, unless "physically impossible or inherently improbable," is sufficient to support a conviction. (*People v. Brown* (2014) 59 Cal.4th 86, 106; see Evid. Code, § 411.) Arcuri's identification of Stewart as the shooter during her interview with the detective—which she listened to and testified about during her conditional examination—was not physically impossible. She acknowledged even in her conditional examination testimony that Stewart came to her bedroom—the bedroom right next door to the murder scene—immediately after the shots were fired. Nor was Arcuri's identification of Stewart as the shooter inherently improbable, given his motive for the murder—Depiazza's orchestration of the burglary and vandalism of Stewart's locked bedroom. A lack of physical evidence linking Stewart to the murder (a gun, a bullet) does not render insufficient the evidence supporting his murder conviction and the true findings on the firearm use enhancements, given the evidence of Stewart's confession to Arcuri and his motive for the murder. Similarly, a lack of evidence of prior violence by Stewart—a fact Stewart highlights on appeal—does not render his conviction and the jury's true findings unsupported by sufficient evidence.

Stewart argues that Ciarrocchi's motive for murder was stronger than Stewart's motive for murder. It was the jury's task to weigh and assess the evidence regarding motive: for Stewart, that Depiazza invited, encouraged, and collaborated with nonresidents of the home to break into Stewart's locked bedroom, vandalize the room, and steal whatever property they wanted; and for Ciarrocchi, that his house was going into foreclosure and Depiazza did not pay rent for a month—one among several residents who did not pay rent—and stole heroin from Ciarrocchi

41

(a drug Ciarrocchi freely gave away to other residents). To the extent the jury found Stewart had a motive for murder, that finding was reasonable based on substantial evidence.

In summary, the evidence showed that Stewart had a motive and was present at the home at the time of the killing; Erekson saw Stewart in possession of a handgun sometime prior to the shooting; Arcuri heard a confrontation between Stewart and Depiazza immediately prior to the shooting; and Stewart admitted to Arcuri that he shot Depiazza two times. After reviewing the entire record, we conclude a reasonable jury could have found Stewart guilty beyond a reasonable doubt of murder and found true the firearm use enhancement allegations, based on substantial evidence presented to the jury.

## II. Denial of Stewart's Request for Removal of Juror for Alleged Bias

Stewart contends the trial court erred in denying his request to remove a juror for alleged bias, and in failing to make further inquiry of the jurors (which neither side asked the court to do).

### A. Proceedings below

At the outset of the third day of the prosecution's case-in-chief—after law enforcement witnesses and Quaid Isaac Erekson testified and a portion of Arcuri's conditional exam was read and a portion of the audio from Arcuri's interviews with detectives was played for the jury, on days prior—Juror No. 3 approached the trial court, outside the presence of the other jurors, and expressed some concerns. The following exchange between the court, Juror No. 3, and counsel for both sides occurred:

"The Court: We're at sidebar with both counsel and Juror Number Three.

42

"Juror No. 3: Yes.

"The Court: Juror 3, there was something you wanted to say?

"Juror No. 3: I have a couple concerns regarding a couple witnesses. Well, that one witness you had brought in yesterday, what was his name? Not Shane.

"[The prosecutor]: Quaid Isaac Erekson?

"Juror No. 3: And the defendant. [¶] Listening to testimony -- and I understand shady people go back and forth, they're on drugs, and not a lot of value can be said to what they do.

"The Court: Hold on. I can't have this kind of discussion about the evidence in the case.

"Juror No. 3: Let me just state my concern. [¶] I'm a little worried. What if we get followed home with what has been conducted so far listening to everything [*sic*]. So, my concern is if we are to be followed home. How can we be safe and sure? I don't want anything --

"The Court: There's nobody in the audience on this case, I mean, with --

"Juror No. 3: What about the defendant though?

"The Court: He's not following anybody.

"Juror No. 3: I understand that. I understand he's in custody. What if he has a possibility of someone to reach out to? Is that possible? Can he reach out to somebody and have us followed?

"The Court: Nobody knows any of your information. They don't know your name, anything about you.

43

"Juror No. 3:  And -- but is there a possibility he could actually, say, reach out to somebody and say, hey, look out for this -- this particular person, blah, blah, blah.

"The Court:  Without knowing anything about you, I mean, the most he can say is her -- is your badge number.

"Juror No. 3:  Okay.

"The Court:  And you're among 14 people.

"Juror No. 3:  I understand that.  But there was a concern just because hearing everything yesterday.  I just don't want to have to worry about certain things.

"The Court:  I understand, and if there is an issue with that, believe me -- I'm here too.  They know my name, and they know [defense counsel], [the prosecutor], and they know witnesses.  So, but --

"[Defense counsel]:  There's a different issue I'm concerned about, the fairness of my client in regards to what this juror is now saying.

"The Court:  Meaning she is concerned she might be followed home?

"[Defense counsel]:  No.  I'm concerned this is -- what she's expressing is prejudicial against Mr. Stewart.

"The Court:  Okay.  Well, we can have that conversation. [¶]  Otherwise, do you have any questions for her?

"[Defense counsel]:  No, other than that.

"The Court:  Anything else you want to express?

"Juror No. 3:  That was just my concern."  The trial court thanked Juror No. 3, and she exited the courtroom.

The discussion between the court, defense counsel, and the prosecutor continued, with defense counsel moving to dismiss Juror No. 3, arguing the juror's concern that Stewart was "able to

44

reach out to get somebody to follow her" showed "a bias and prejudice against" Stewart. Defense counsel pointed out that neither Stewart nor any witness had stared at the jurors or done anything to intimidate them. He also noted this case is not gang-related, and the "events in this case ha[ve] been limited to one house and the participants inside." Defense counsel further asserted Juror No. 3's comments about witnesses indicated she was "prejudging this case before the court's instructions."

The prosecutor disputed Juror No. 3 had "voiced a bias or prejudice," arguing "most people if they sit and hear the type of evidence that has been presented to the jury would be fearful or potentially that's something that might have entered their mind. She has just voiced that to the court. She has not voiced a bias or prejudice." The prosecutor also asserted that Juror No. 3's comment about the credibility of Erekson's testimony "seems helpful for the defense because she talked about people of his ilk [and] not being able to believe them."

The trial court disagreed with defense counsel's assertion Juror No. 3 was "prejudging" the case. The court stated: "She's not prejudging. She's hearing evidence. None of it is really pleasant. [¶] What she did was she seemed to be reflecting on what she heard so far. She didn't say she would stop deliberating or would stop listening. She said she was concerned about her safety because of the element in the courtroom on the stand and otherwise." The court added: "I think the jurors are here to make a decision about the case that would impact Mr. Stewart, and if it impacts him negatively, it's logical a person would think that there might be some ramification to them."

The trial court also disagreed with defense counsel's statement that the events in this case were contained within the

45

house where the shooting occurred.  The court noted Erekson, who was not a resident, came into the house and stole items from Stewart's room.  Then, as summarized by the court, Erekson "saw the light and realized maybe he messed around with the wrong guy and returned the property."  The court commented:  "I don't necessarily think there's some wall around that house and that everything necessarily happens in that house."

The trial court denied defense counsel's motion to dismiss Juror No. 3.  A couple minutes later, Juror No. 11 came into the courtroom, and the following exchange occurred, outside the presence of the other jurors:

"The Court:  There's another juror.  [¶]  This is juror number?

"Juror No. 11:  11.

"The Court:  Okay.  You wanted to talk?

"Juror No. 11:  Yeah.  I just have a simple question.  It's because development of the trial and some attitudes we're seeing [*sic*].

"The Court:  Okay.  Just tell me the theme you want to talk about without details.

"Juror No. 11:  Retribution against jury members.

"The Court:  Okay.  You want to ask a question about it?

"Juror No. 11:  Is that possible?  [¶]  I mean, they don't know us.  They don't -- do they know us?  Do they --

"The Court:  No.  They only know your badge number.  That's the only thing that was said in court.

"Juror No. 11:  Okay.

"The Court:  Nobody --

"Juror No. 11:  There's no way --

"The Court:  Nobody has information about you.

"Juror No. 11:  I'm worried about my family, not me personally, but, you know, they don't know where we live or --

"The Court:  No.  Okay?

"Juror No. 11:  That's fine.

"The Court:  Okay.

"Juror No. 11:  It came to me yesterday during the trial. So, you know --  [¶]  Okay.

"The Court:  I appreciate the question.

"Juror No. 11:  I didn't want to be unfair and sit there and have something in my mind that would alter my judgment --

"The Court:  Sure.

"Juror No. 11:  -- at all, so I'm clear.

"[Defense counsel]:  This is not going to -- this thought is not going to affect your ability to make a decision?

"Juror No. 11:  Absolutely not.  I was just ignorant of that, and I didn't realize that.

"The Court:  You're not the first person in trials -- in the history of trials to ask that question.  So --

"Juror No. 11:  Very good.

"The Court:  I understand.  [¶]  Okay.

"Juror No. 11:  Thank you, Your Honor."  Defense counsel did not ask the trial court to remove Juror No. 11.

After Juror No. 11 exited the courtroom, the prosecutor suggested the trial court follow up with Juror No. 3 and ask her the question defense counsel asked Juror No. 11 ("this thought is not going to affect your ability to make a decision?").  The trial court agreed to bring Juror No. 3 back for further inquiry.  Before the juror entered the courtroom, the following exchange occurred between the court and defense counsel:

47

"The Court: Let's do it. [¶] You know, here's one thing: Fairness is different once the evidence has started. Fairness at the beginning is fair, but once you started hearing people and they heard part of the People's case and heard opening statements, it's not fair. It's are you -- are you -- do you understand your obligation to keep an open mind until the end of the trial. And are you doing that?

"[Defense counsel]: That's fine. I can ask that question. But they're not supposed to come to any conclusions.

"The Court: That's fair.

"[Defense counsel]: You can ask her if she made any conclusion because --

"The Court: I can't ask about conclusion, but I can ask, you know your obligation to keep an open mind. Are you still doing that?

"[Defense counsel]: Okay. That's fine.

"The Court: Good enough?

"[Defense counsel]: That's good enough."

Juror No. 3 entered the courtroom and the trial court inquired as follows:

"The Court: Hello. [¶] This is Juror [No. 3]. [¶] So, I have one question I didn't ask. [¶] Do you understand you have an obligation to keep an open mind until the end of the case? Can you still do that?

"Juror No. 3: Absolutely.

"The Court: Okay. Thank you.

"Juror No. 3: I just want to make clear, I'm not trying to get out of this.

"The Court: No, no. I don't think you are. No. I just had to ask that question.

48

"Juror No. 3: I wanted to state I'm not trying to get out of this. I will be clear and open minded, but I also have a responsibility to my family and our safety.

"The Court: I understand.

"Juror No. 3: So, I had to ask.

"The Court: I understand. You're not the first person in the history of the jurydom [*sic*] to ask that.

"Juror No. 3: I didn't watch any movies on juries or -- didn't influence me [*sic*], but --

"The Court: Okay. I appreciate that. [¶] Okay. Thank you.

"[Defense counsel]: Okay."

After Juror No. 3 exited the courtroom, defense counsel noted he had already made a motion for Juror No. 3's removal. The trial court commented: "I think it's a legitimate concern for people serving on a criminal case especially murder cases. They want to make sure they can act in the vacuum of the jury room in their job as a juror and not have it spread out to their family lives where honestly it could impact how they vote in the case. [¶] If they feel secure in what they are doing, they can do a fair job, and I haven't heard that anything prompted either of them to ask that question."

Then, the trial court inquired of counsel: "Is there anything happening in the hallways. Who are the people coming to trial to watch?" Defense counsel explained that whenever he exited the courtroom at lunchtime or at the end of the day, he waited for the jurors to go down the elevator before he took the elevator, and he had not observed any interaction in the hallway between a juror and a witness. Defense counsel also stated he believed the two men in the courtroom watching the trial were

49

friends of Stewart, but they were not witnesses. Defense counsel did not believe the two men had said or done anything to intimidate the jurors.

The trial court further inquired of counsel: "Should I have anything to be concerned about what's going on with these jurors, and is there something else going on?" Defense counsel responded: "Not that I'm aware of. My client has no other charges, nothing else pending." The court replied: "I'm going to keep thinking about this issue."

Based on the record, there was no further discussion about this issue and no further concern expressed by any juror.

**B.    Applicable law and analysis**

Under section 1089, a trial court may discharge a juror for good cause if the court determines the juror is unable to perform his or her duty. "A sitting juror's actual bias that would have supported a challenge for cause also renders the juror unable to perform his or her duties and thus subject to discharge." (*People v. Romero* (2017) 14 Cal.App.5th 774, 781.) " 'Actual bias' in this context is defined as 'the existence of a state of mind on the part of the juror in reference to the case, or to any of the parties, which will prevent the juror from acting with entire impartiality, and without prejudice to the substantial rights of any party.' " (*Id.* at p. 780, quoting Code Civ. Proc., § 225, subd. (b)(1)(C).) "Once a trial court is put on notice that good cause to discharge a juror may exist, it is the court's duty 'to make whatever inquiry is reasonably necessary' to determine whether the juror should be discharged." (*People v. Espinoza* (1992) 3 Cal.4th 806, 821; *People v. Cunningham* (2001) 25 Cal.4th 926, 1029.)

The " 'ultimate decision whether to retain or discharge a juror[] rests within the sound discretion of the trial court.

50

[Citation.]  If any substantial evidence exists to support the trial court's exercise of its discretion pursuant to section 1089, the court's action will be upheld on appeal.'  [Citation.]  'The juror's inability to perform must appear as a "demonstrable reality" and will not be presumed.' "  (*People v. Sattiewhite* (2014) 59 Cal.4th 446, 486.)  " 'The decision whether to investigate the possibility of juror bias, incompetence, or misconduct—like the ultimate decision to retain or discharge a juror—rests within the sound discretion of the trial court.' "  (*People v. Manibusan* (2013) 58 Cal.4th 40, 53.)

A juror's concern about her or her family's safety does not necessarily mean the juror is biased against the defendant and unable to perform her duty.  (See, e.g., *People v. Navarette* (2003) 30 Cal.4th 458, 500.)

For the reasons explained below, we conclude the trial court did not abuse its discretion in declining to remove Juror No. 3[18] and in not inquiring further of the jurors (an inquiry neither side asked the court to make).

There is no indication that any juror was influenced by information from outside the trial.  Juror No. 3 and Juror No. 11 expressed safety concerns based on the testimony they heard in this case.  The trial court's comments in allaying the two jurors' concerns were proper, and there is no indication the jurors had lingering concerns that would have affected their abilities to properly discharge their duties as jurors.  No further concerns were raised, and there is no indication the jurors' earlier concerns affected deliberations.  As set forth above, we do not presume a

---

[18] Stewart did not ask the trial court to remove Juror No. 11, and he does not argue on appeal that the court should have removed Juror No. 11.

51

juror's inability to perform his or her duties; such inability must appear on the record as a demonstrable reality. (*People v. Sattiewhite*, *supra*, 59 Cal.4th at p. 486.) Juror No. 3—the only juror Stewart asked the court to remove—stated she would remain openminded until the end of the case (i.e., not allow her safety concerns to influence her decision).

Stewart argues the trial court should have asked Juror No. 3 and Juror No. 11 (1) specifically "whether their concerns would affect their ability to be fair and impartial" and (2) whether they had discussed these concerns, or [Juror No.] 3's opinions of Stewart and witnesses, with any of the other members of the jury." Neither defense counsel nor the prosecutor asked the trial court to make such an inquiry, and we conclude the trial court did not err in not making such an inquiry of its own accord.

As discussed above, it is within the trial court's discretion to make whatever inquiry is reasonably necessary to determine if it should discharge a juror. The court found the two jurors' concerns to be rational, based on the evidence in the case, and not an indication that they were prejudging the case or harbored an improper bias. The court explained to the two jurors who expressed a concern that they were not in danger and that their identifications were protected. The record indicates the two jurors were satisfied with the court's explanation, and their concerns would not affect their abilities to discharge their duties. It is reasonable that the court would not highlight these concerns to other jurors who had not expressed such concerns, either by addressing the entire jury or questioning each juror individually. Moreover, based on the record before us, we have no reason to conclude the jurors who expressed a concern were unable to perform their duties with impartiality and without prejudice to

Stewart's substantial rights, even though the court did not specifically use the words "fair" and "impartial" in its inquiry of them.

## III.    Denial of Stewart's Motion for New Trial

Stewart contends the trial court abused its discretion in denying his motion for new trial based on insufficiency of the evidence and ineffective assistance of counsel for failure to call a specific witness at trial.

We review a trial court's ruling on a motion for new trial for abuse of discretion.  Such a ruling " ' "is so completely within that court's discretion that a reviewing court will not disturb the ruling absent a manifest and unmistakable abuse of that discretion." ' "  (*People v. Thompson* (2010) 49 Cal.4th 79, 140.)  A trial court abuses its discretion in ruling on a motion for new trial if it bases "its decision on impermissible factors [citation] or on an incorrect legal standard [citations]."  (*People v. Knoller* (2007) 41 Cal.4th 139, 156.)

### A.    Proceedings below

At a hearing after the jury returned its guilty verdict on the murder charge, the trial court appointed new defense counsel for Stewart because Stewart wanted to move for new trial based in part on ineffective assistance of trial counsel.  Stewart's new counsel filed a motion for new trial based on the following grounds:  (1) Stewart's trial counsel "was incompetent for not calling [Stewart's friend] Shirley Knocke, a potential defense witness, who would have testified that the homeowner . . ., Bruce Ciarrocchi, admitted to her that he [Bruce] was the actual killer"; (2) trial counsel failed to require a due diligence hearing before the admission into evidence of the transcript of Arcuri's

53

conditional examination;[19] and (3) insufficiency of the evidence within the meaning of section 1181, subdivision (6) (as stated in the motion, "[t]he defense is asking [the trial] court to sit as the thirteenth juror and grant a new trial based on the insufficiency of the evidence").

Stewart attached to his new trial motion (1) a letter Shirley Knocke wrote a few months after the jury in the second trial returned its guilty verdict on the murder charge, describing Bruce Ciarrocchi's alleged confession to the murder[20] and (2) a report from trial counsel's investigator describing his interview with Knocke, which he conducted on October 13, 2017, while Stewart's second trial was underway.

The prosecution did not file a written opposition but orally opposed the new trial motion at an evidentiary hearing. Stewart called witnesses at the evidentiary hearing. Leonard Garber,

_____

[19] On appeal, Stewart does not argue his trial counsel should have requested a due diligence hearing for Regina Arcuri, and he does not contend the trial court abused its discretion in declining to grant a new trial on this ground. We include below a summary of trial counsel's testimony regarding his decision not to request a due diligence hearing because the factual circumstances are relevant to Garber's decision not to call Shirley Knocke as a witness, an issue Stewart does raise on appeal.

[20] The letter indicates Knocke wrote it to the trial judge. Knocke provided copies of the letter to courtroom staff and Stewart's new defense counsel. Courtroom staff gave the court's copy of the letter to the prosecutor. The trial judge did not see the letter until Stewart filed his motion for new trial. We do not include a summary of the letter because Knocke testified at the evidentiary hearing, and we summarize her testimony below.

54

Stewart's trial counsel, and Shirley Knocke testified.  The prosecution did not call any witnesses.

### B. Investigation report regarding Shirley Knocke

In his report, the investigator wrote the following about his October 13, 2017 discussion with Knocke regarding her conversation with Bruce Ciarrocchi:

"Ms. Knocke told me that she addressed Bruce by saying: Too bad about Randy [Stewart] being in jail.  Bruce responded: He will not stay there too long.

"Ms. Knocke told me that she then asked Bruce:  How do you know that?  And Bruce responded:  He didn't do it.

"Ms. Knocke told me that she asked Bruce:  Who did it then?  Bruce responded by '[t]apping [his] right hand on his chest several times, indicating he did it.'

"Ms. Knocke told me that she then asked Bruce:  Don't you feel guilty for Randy being in jail?  Bruce responded:  No, he is going to get out pretty soon."  (Bold font omitted.)

As set forth in the report, although the investigator considered "Knocke to be a good witness for [the] [d]efense," the investigator had reservations about Knocke's statement because: (1) she waited until Stewart's second trial was underway before making this statement, even though her alleged conversation with Ciarrocchi occurred before Stewart's first trial (Ciarrocchi died before the first trial); and (2) she did not report the information to the police, and indicated she had no intention of reporting the information to the police, even if Garber had not agreed to meet with her and refer her to his investigator.

55

## C.    Trial counsel's testimony

Garber represented Stewart at his preliminary hearing, his first trial held in July 2017,[21] and his second trial held in October 2017.

Garber testified that he first became aware of Shirley Knocke when she accompanied Stewart's girlfriend, Marjorie Bellhouse, to a meeting in Garber's office in May 2016, around 10 months before Stewart's preliminary hearing. At that meeting, Knocke did not mention Bruce Ciarrocchi or state she had information about Depiazza's murder. Instead, she informed Garber "that she was a driving force to get someone else off [a defendant in a criminal case], and that she knew how to do it."[22] She added that "she was aware of the system, and she was aware of what had to be done, or what she could do to help."

Garber explained why he did not request a due diligence hearing before Regina Arcuri's testimony from her conditional examination was read to the jury at the trial at issue here (the second trial). Garber did not believe it was in Stewart's interest to challenge the admission of Arcuri's conditional examination testimony in which she stated Ciarrocchi was the shooter because

---

[21] As described above, at the first trial, the jury found Stewart guilty on the vandalism charge but could not reach a verdict on the murder charge, and the trial court declared a mistrial as to the murder charge.

[22] At a prior hearing, Stewart's newly appointed defense counsel informed the trial court that Knocke "was the instigator" who approached an innocence project in a high-profile murder case with information that led to the defendant's exoneration. The trial court indicated it was familiar with that other case and Knocke's role.

56

Arcuri had previously told Garber's investigator a version of events that did not include Ciarrocchi as the shooter, as summarized below. As Garber characterized it, Arcuri "had statements that were all over the place," including her statement to detectives that Stewart was the shooter.

According to Garber, Arcuri gave a statement to Garber's investigator in July 2016, a year before her conditional examination, and the statement was different from her testimony at the conditional examination (which was different from her statements to detectives).[23] In the statement to the defense investigator (given before Ciarrocchi died), Arcuri did not say Ciarrocchi shot Depiazza, as she did during her later conditional examination (which occurred after Ciarrocchi died). Arcuri told the defense investigator a version of the events in which she did not identify the shooter, stating she was staying with Shirley Knocke (Stewart's friend) and Marjorie Bellhouse (Stewart's girlfriend) and "she didn't want to tell the truth in front of them." Arcuri told the investigator that Quaid Isaac Erekson and Kysch were present at the time of the shooting, and Kysch told Arcuri that she and Erekson dragged Depiazza's body out to the garage and cleaned up the blood. Thereafter, they asked Arcuri to inspect the house for any blood they missed. Arcuri told the defense investigator that she did not provide this information to the detectives because she was afraid of Erekson.

---

[23] The investigation report summarizing Arcuri's July 2016 statement to Garber's investigator is not in the record before us. Stewart did not attach it to his motion for new trial. His new counsel showed it to Garber at the evidentiary hearing on the motion for new trial, and Garber testified about its contents.

Turning to his second interaction with Shirley Knocke, Garber testified that Knocke approached him at the courthouse in October 2017, as the second trial was getting underway, and informed him that she had learned some information about the shooting from a conversation with Bruce Ciarrocchi (who died in December 2016). Knocke did not tell Garber that Ciarrocchi expressly stated he killed Depiazza; rather Knocke said Ciarrocchi "pointed to himself, and said that Mr. Stewart would be out of trouble because he was going to be cleared." Garber asked his investigator to interview Knocke and prepare a report. After speaking to his investigator and reviewing the report (which we summarized above), Garber decided not to conduct his own follow-up interview with Knocke, explaining, "I didn't do it because I felt I wasn't going to call her because I felt she was lying." Garber testified he was suspicious about Knocke's new information because (1) she did not bring it to him until Stewart's second trial, even though Ciarrocchi allegedly confessed to her before the first trial; (2) Arcuri did not mention Ciarrocchi as the shooter until her conditional examination in July 2017, after Ciarrocchi's death; and (3) Stewart's girlfriend, Bellhouse, did not mention to Garber before the first trial that her friend Knocke had information helpful to Stewart's case. Garber's investigator shared Garber's suspicions about Knocke's new information, as set forth in the investigator's report. Garber mentioned during his testimony that Knocke had a criminal history involving theft and drugs like the other persons involved in this case.

### D.     Shirley Knocke's testimony

Knocke testified she had been friends with Stewart for at least 30 years, and she met Marjorie Bellhouse when Bellhouse became Stewart's girlfriend several years before this evidentiary

58

hearing.  Knocke also knew Ciarrocchi, Kysch, and Arcuri.  She never visited the house where the shooting occurred, but she knew Ciarrocchi owned it.

Knocke stated that when she visited Garber's office with Bellhouse in 2016, she told Garber she was going to talk to Ciarrocchi.  Thereafter, she spoke to Ciarrocchi several times before his death in December 2016.  During the first conversation, she asked Ciarrocchi who killed Depiazza.  In response, Ciarrocchi pounded twice on his chest with his right fist.  Ciarrocchi told her he was upset with Depiazza because Depiazza was not paying his rent.  Ciarrocchi asked Depiazza to move out of the home, but Depiazza did not move out.  Knocke "was under the impression" that Bruce was "intimidated by" Depiazza.  Ciarrocchi also told Knocke that the night before the shooting, Depiazza raped Kysch, and Ciarrocchi "was really upset about it" because he "was extremely fond of" Kysch.  The next day, Ciarrocchi confronted Depiazza about the rent situation and the rape.  Ciarrocchi brought a gun with him; Knocke "guess[ed]" it was because "he felt intimidated."  Ciarrocchi told Knocke that Depiazza "came at him," he "got scared," and he "shot the gun twice before [Depiazza] stopped."  Ciarrocchi also told her he "got rid of [the] body" by dumping it in Riverside with the help of an unidentified man.  Ciarrocchi said he used bolt cutters to cut off three or four of Depiazza's fingers "to try to make him unidentifiable."  He did not cut off the rest of Depiazza's fingers because "it grossed him out" and he could not finish.

According to Knocke, Ciarrocchi expressed remorse about the killing and became teary-eyed.  He said he "didn't mean for it to happen."  Knocke asked Ciarrocchi if he felt guilty that Stewart was in jail for something Ciarrocchi did.  Ciarrocchi told

59

her there was no evidence against Stewart and he would not be convicted, so he would only be in jail through trial. Knocke did not know why Ciarrocchi would disclose all of this information to her when she had not known him for very long. She speculated: "Because he knew how much I helped [the defendant in the other case], and I guess he thought it would be helpful. I don't know why. I really don't know why. I wondered that myself. I think he just wanted to talk, and I was there, and he found me trustworthy."

Knocke testified that prior to Stewart's first trial, she "was not able to get ahold of" Garber to give him the above-described information she had learned from Ciarrocchi about the shooting. Beginning the day after her first conversation with Ciarrocchi, she called Garber's office several times and left messages with his secretary, but he did not call her back. She knew Bellhouse was "in touch" with Garber, so she asked Bellhouse to tell Garber she needed to talk to him. Bellhouse told Knocke she relayed the message to Garber, but Garber did not say anything to her (Bellhouse) about it. Knocke did not tell Stewart about the information she learned from Ciarrocchi during the numerous telephone calls Stewart made to her from jail. Nor did she report the information to the police. She testified that, within a week of her conversation with Ciarrocchi regarding the shooting, she did tell Bellhouse, Arcuri, her friends, and her sons about it.

Knocke did not describe much about the substance of her subsequent conversations with Ciarrocchi. She recalled that they talked once when he "came by [her] house." On another occasion, she talked to him at Bellhouse's home "when [she] went to visit her, and he happened to be there." Knocke said he "didn't really like talking about" the shooting, so they spoke about other things

60

like his mother's death.  During questioning by the trial court about these subsequent conversations, Knocke recalled Ciarrocchi said he told Arcuri and Kysch "to lie about who did the shooting" or he would "cut them both off" and stop supplying them with heroin.  Knocke also recalled she told Ciarrocchi that when Arcuri was staying at her home, Arcuri first told her that Erekson was the shooter; then she told Knocke that Ciarrocchi was the shooter.

Knocke stated that around the time of the second trial, Bellhouse asked Garber if he wanted Knocke to testify.  Garber told Bellhouse to have Knocke meet him at the courthouse.  Knocke went to the courthouse and briefly spoke to Garber, who "was in a hurry" and "working on another case."  Knocke told Garber she had talked to Ciarrocchi.  She told him some of what Ciarrocchi said, but not everything.  Garber said he would have his investigator call her.  The investigator called Knocke, and they spoke on the phone three or four times over the next week.  She acknowledged during her testimony that she did not tell the investigator that Ciarrocchi expressly admitted to shooting Depiazza; she only told the investigator that Ciarrocchi "hit himself on the chest indicating himself."  She explained that she told the investigator "what [she] could remember from that conversation" with Ciarrocchi.

According to Knocke, Garber's investigator told her she "was a very good witness" and "Garber was going to use [her] in court."  Therefore, during Stewart's second trial, she came to court and sat outside the courtroom a couple times, "hoping [she] would be called" as a witness.  Garber never told her he planned to call her as a witness.

In response to questioning by the trial court, Knocke testified that she is 72 years old and has memory issues due to "old age."

### E.    Trial court's ruling

After hearing argument from the parties on Stewart's ineffective assistance of counsel claim in his motion for new trial, the trial court took the matter under submission. Thereafter, the court issued a minute order denying the motion for new trial based on ineffective assistance of counsel. Although the court found Knocke "presented [as] very credible," the court also found Garber's testimony regarding his reasons for not calling Knocke as a witness at Stewart's second trial to be "credible and reasonable."

At a subsequent hearing, defense counsel reminded the trial court it had not ruled on Stewart's insufficiency of the evidence claim in his motion for new trial. The court replied, "So you're asking for a specific finding" by the court "as a 13th juror." Defense counsel responded affirmatively. The court ruled as follows:

"The court denies on that ground, too. I sat through the trial. I think a reasonable jury could have found the way that they did. I didn't see anything glaring that would jump out to me that would make me think there was any type of error in what the jurors did. There was a lot of evidence in the case that was -- it was a long case. People could defer [*sic*] about their interpretation of things, but I don't think there was insufficient evidence. Maybe an appellate court will disagree."

## F. Applicable law and analysis – sufficiency of the evidence claim

In ruling on a motion for new trial made on the ground that the verdict is contrary to the evidence under section 1181, subdivision (6), "the trial court's function is to 'see that the jury intelligently and justly perform[ed] its duty and, in the exercise of a proper legal discretion, to determine whether there is sufficient credible evidence to sustain the verdict.' [Citation.] The trial court's duty is to review the evidence independently and satisfy itself that the evidence as a whole is sufficient to sustain the verdict." (*People v. Dickens* (2005) 130 Cal.App.4th 1245, 1251.) The "presumption that the verdict is correct does not affect the trial court's duty to give the defendant the benefit of its independent determination as to the probative value of the evidence." (*Id.* at p. 1252.) "In short, the trial court 'extends no evidentiary deference' when ruling on a new trial motion under section 1181, subdivision (6). [Citation.] 'Instead, it independently examines all evidence to determine whether it is sufficient to prove each required element beyond a reasonable doubt *to the judge*, who sits, in effect, as a "13th juror." ' " (*People v. Watts* (2018) 22 Cal.App.5th 102, 112.) "The trial court has broad discretion in determining whether the evidence has sufficient probative value to sustain the verdict [citation], and its order will not be reversed on appeal 'absent a manifest and unmistakable abuse of that discretion.' " (*Dickens*, at p. 1252.)

Stewart asserts: "From the record, it appears the trial court misunderstood the duty to independently reweigh the evidence to satisfy itself that the evidence as a whole is sufficient to sustain the verdict." He adds: "Here, it appears the court simply gave deference to the jury's weighing of the evidence

63

without making an independent review and deciding the proper weight to accord it." The record belies Stewart's assertions.

When defense counsel reminded the trial court that it had not yet ruled on Stewart's insufficiency of the evidence claim in the motion for new trial, the court responded: "So you're asking for a specific finding" by the court "as a 13th juror," a statement consistent with the court's obligation when ruling on such a claim. (*People v. Watts*, *supra*, 22 Cal.App.5th at p. 113 [in ruling on an insufficiency of the evidence claim in a motion for new trial, the court " 'independently examines all evidence to determine whether it is sufficient to prove each required element beyond a reasonable doubt *to the judge*, who sits, in effect, as a "13th juror" ' "].) At the conclusion of its ruling on Stewart's insufficiency of the evidence claim, the court stated, "I don't think there was insufficient evidence." The court was not deferring to the jury's verdict there, it was expressing its own independent opinion after hearing the evidence. (*People v. Price* (1992) 4 Cal.App.4th 1272, 1275 ["the court's exercise of its independent judgment is reflected in its statement that the evidence was sufficient. The court's further comment there was substantial evidence to support the jury's determination is surplusage"].)

This is not a case like *People v. Watts*, *supra*, 22 Cal.App.5th 102—a case Stewart cites on appeal—where this court reversed the trial court's order denying a motion for new trial for abuse of discretion because the trial court, in ruling on a claim of insufficiency of the evidence, concluded there was sufficient evidence to let the matter *go to the jury* for decision ("there was evidence to let the jury decide"), an incorrect standard for ruling on such a claim. (*Id*. at pp. 110-111, 115.) Here, the trial court found the evidence sufficient to sustain the

64

jury's verdict. The record does not indicate the court applied an incorrect standard.

### G. Applicable law and analysis – ineffective assistance of counsel claim

Stewart contends the trial court abused its discretion in denying his motion for new trial based on ineffective assistance of trial counsel in failing to call Shirley Knocke as a witness at the second trial.

"[I]neffectiveness of counsel may be argued in a new trial motion." (*People v. Smith* (1993) 6 Cal.4th 684, 693.) " 'To establish a violation of the constitutional right to effective assistance of counsel, a defendant must show both that his counsel's performance was deficient when measured against the standard of a reasonably competent attorney and that counsel's deficient performance resulted in prejudice to defendant in the sense that it "so undermined the proper functioning of the adversarial process that the trial cannot be relied on as having produced a just result." ' " (*People v. Thompson, supra*, 49 Cal.4th at p. 122.)

"Reviewing courts defer to counsel's reasonable tactical decisions in examining a claim of ineffective assistance of counsel [citation], and there is a 'strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance.' " (*People v. Lucas* (1995) 12 Cal.4th 415, 436-437.) " 'Reviewing courts will reverse convictions on the ground of inadequate counsel only if the record on appeal affirmatively discloses that counsel had no rational tactical purpose for his act or omission.' " (*People v. Zapien* (1993) 4 Cal.4th 929, 980.)

Garber's decision not to call Knocke as a witness at the second trial was a tactical one, which was not unreasonable.

First, Knocke was not an impartial witness. She had been friends with Stewart for 30 years. Bellhouse and Arcuri stayed at her home for some period of time while Stewart was in jail on the murder charge.

Second, there were questions about why Knocke did not make a statement about Ciarrocchi being the shooter until Stewart's second trial was underway, although she claimed to have known the information for around a year before that. She did not report the information to the police. She did not tell Stewart about it, even though he phoned her frequently from jail, and she was allegedly having trouble getting in touch with his attorney. Calling a witness whose testimony raises credibility questions can result in those credibility questions permeating the entire defense case or tainting other defense witnesses by association.

Third, while Stewart argues that Knocke's testimony would have corroborated and enhanced Arcuri's conditional examination testimony, an equally strong argument could be made that Knocke's testimony would have damaged the credibility of Arcuri's conditional examination testimony that Ciarrocchi was the shooter. Knocke asserts that in one of her conversations with Ciarrocchi about the shooting, she told him that Arcuri gave many accounts of the shooting, initially telling Knocke that Erekson was the shooter. Moreover, the fact that Knocke and Bellhouse continued to socialize with Ciarrocchi after Ciarrocchi purportedly told Knocke he killed Depiazza, and Knocke expressed no fear of Ciarrocchi, belied Arcuri's claim she did not come forward with her information about Ciarrocchi until after he died because he threatened to kill her if she told anyone he was the shooter.

Fourth, Knocke's statement that Ciarrocchi told her he was the shooter because he trusted her—a close personal friend of Stewart and Bellhouse—and he wanted to be "helpful"—which would have put his own liberty in jeopardy was questionable.

Fifth, Knocke's statement that Ciarrocchi told her he used bolt cutters to cut off some of Depiazza's fingers so the body could not be identified contradicted the pathologist's determination that a small animal chewed off the fingers on Depiazza's right hand.

Finally, Knocke testified at the evidentiary hearing that she was a 72-year-old woman with memory problems due to her age.

Garber's decision not to conduct a follow-up interview with Knocke—after speaking with her briefly at the courthouse, speaking with his investigator about the interview with Knocke, and reviewing the investigator's report about the interview—does not constitute ineffective assistance of counsel. The concerns about Knocke's potential testimony were evident at that point, and Garber had sufficient information to support a reasonable and tactical decision not to call Knocke as a witness at the second trial.

For these reasons, the trial court did not abuse its discretion in denying Stewart's motion for new trial based on ineffective assistance of trial counsel.[24]

## IV. Prior Prison Term Enhancements

Stewart contends the prior prison term enhancements under section 667.5, subdivision (b) that the trial court stayed

---

[24] We reject Stewart's contention that cumulative error requires reversal of his conviction. As explained above, there are no errors here to cumulate.

must be stricken in light of Senate Bill No. 136.  At the time of his sentencing hearing, section 667.5, subdivision (b) provided a one-year sentence enhancement for prior prison or county jail terms served for felony convictions.  Senate Bill No. 136 amended section 667.5, subdivision (b) to impose the enhancement only if the prior prison or county jail term was served "for a sexually violent offense as defined in subdivision (b) of Section 6600 of the Welfare and Institutions Code."  (§ 667.5, subd. (b); Stats 2019, ch. 590, § 1.)  The amendment went into effect on January 1, 2020, before the judgment of Stewart's conviction became final.  (See Cal. Const., art. IV, § 8, subd. (c).)  Stewart contends, the Attorney General concedes, and we agree, the new legislation applies retroactively in Stewart's case.  (See *People v. Lopez* (2019) 42 Cal.App.5th 337, 341-342 [applying Senate Bill No. 136 retroactively when appeal not final by January 1, 2020].)

Stewart served seven prior prison terms for drug and theft-related convictions, none of which are sexually violent offenses.  (See Welf. & Inst. Code, § 6600, subd. (b).)  We therefore strike the prior prison term enhancements the trial court stayed because section 667.5, subdivision (b), as amended, does not allow for the enhancement in Stewart's case.

**V.  Firearm Enhancements**

Stewart contends the matter must be remanded because the trial court did not exercise informed discretion and consider whether to impose a term less than 25 years to life for the firearm enhancement.

**A.  Proceedings below**

At the sentencing hearing, defense counsel asked the trial court to strike the prior conviction for purposes of the Three Strikes law and also strike the 25-years-to-life firearm

68

enhancement under section 12022.53, subdivision (d). Defense counsel argued a sentence of 15 years to life for second degree murder was sufficient punishment based on the facts of the case, Stewart's age (59), and the absence of prior violence in his criminal history. Counsel further asserted that if the court declined to strike the prior conviction and the section 12022.53, subdivision (d) enhancement, Stewart's sentence would effectively amount to life without the possibility of parole.

The trial court declined to strike the prior conviction or the section 12022.53, subdivision (d) firearm enhancement, stating it "just can't see how that would be in the interest of justice." The court expressed concern about (1) Depiazza's body being driven to and dumped in another county; and (2) "the barricade issue," i.e., Stewart's failure to exit the home for several hours when law enforcement executed the warrant for Ciarrocchi's arrest and ordered everyone to come outside.

**B.     Applicable law and analysis**

Under section 12022.53, subdivision (h), "The court may, in the interest of justice pursuant to Section 1385 and at the time of sentencing, strike or dismiss an enhancement otherwise required to be imposed by this section."

In this case, the jury returned true findings on the three firearm use enhancement allegations under section 12022.53: personal use of a firearm under section 12022.53, subdivision (b) (a 10-year enhancement); personal and intentional discharge of a firearm under section 12022.53, subdivision (c) (a 20-year enhancement); and personal and intentional discharge of a firearm causing death under section 12022.53, subdivision (d) (a 25-years-to-life enhancement).

69

At the sentencing hearing, Stewart asked the trial court to strike the 25-year-to-life firearm enhancement under section 12022.53, subdivision (d). There was no discussion at the hearing about the fact the jury had found true the firearm use enhancements under section 12022.53, subdivisions (b) and (c). Nor was there any discussion about the court's discretion to substitute one of the lesser firearm use enhancements for the greater one. (See *People v. Tirado* (2019) 38 Cal.App.5th 637, 644, review granted Nov. 13, 2019, S257658 [if the jury had found all three section 12022.53 enhancements to be true, "the court would have had the discretion to strike the section 12022.53, subdivision (d) enhancement and then either impose one of the other two enhancements or strike them as well"].)

Because the issue of striking the greater and imposing a lesser firearm enhancement under section 12022.53 was a new issue in the courts, we conclude Stewart did not forfeit the issue by failing to raise it below. It is not clear from the record that the trial court or the parties were aware of the trial court's discretion in this regard. " 'Defendants are entitled to "sentencing decisions made in the exercise of the 'informed discretion' of the sentencing court," and a court that is unaware of its discretionary authority cannot exercise its informed discretion.' " (*People v. McDaniels* (2018) 22 Cal.App.5th 420, 425.)

The record does not show a remand would be futile in this instance. Nothing in the trial court's comments indicates it would not have imposed a 10 or a 20-year term for the firearm enhancement instead of 25 years to life if it understood it had that discretion. (*People v. McDaniels*, *supra*, 22 Cal.App.5th at p. 423 ["a remand is necessary because the record contains no clear indication that the trial court will not exercise its discretion to

70

reduce [the defendant's] sentence"].)  Accordingly, we remand the matter for the trial court to exercise its informed discretion and consider whether to substitute the firearm enhancement under section 12022.53, subdivision (b) or (c) for that imposed under section 12022.53, subdivision (d).

## DISPOSITION

The judgment is modified to strike the one-year prior prison term enhancements the trial court stayed under section 667.5, subdivision (b).  Upon remand, the trial court shall determine whether to strike the firearm enhancement under section 12022.53, subdivision (d) and impose the enhancement provided under section 12022.53, subdivision (b) or (c).  If the court strikes the section 12022.53, subdivision (d) enhancement, the court shall reduce the sentence accordingly.  The clerk of the superior court is directed to prepare an amended abstract of judgment and to forward it to the Department of Corrections and Rehabilitation.  In all other respects, the judgment is affirmed.

NOT TO BE PUBLISHED

CHANEY, J.

We concur:

BENDIX, Acting P. J.                    FEDERMAN, J.*

---

\* Judge of the San Luis Obispo County Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.